JANVIER, Judge.
This is a controversy over the question of whether a fund of $15,000, deposited by certain libelees as a step towards the possible settlement of an admiralty proceeding, belongs to Ralph Stovall, the owner of the vessel known as Quarterboat Rex, which was lost in a maritime disaster and from which the libel proceeding resulted.
On December 21, 1956, Firemen’s Fund Insurance Company issued to Ralph Eugene Stovall its “hull” policy in the sum of $30,000. This policy covered the Quar-terboat in question, which was then in the State of Texas and which, according to the policy, was to be used in the inland waters in the States of Louisiana and Texas. Stovall was a citizen of Texas, the boat at that time was in Texas, the policy was issued in Texas, and was not countersigned by an agent licensed to do business in the State of Louisiana, and no part of the earned commission was paid to a Louisiana agent. At its expiration that policy was renewed in all of its terms. At the time of renewal the vessel was in the State of Louisiana. The renewal was not counter *714 signed by an agent licensed to do business in Louisiana and no commission on the renewal was paid to a Louisiana agent.
'On August 14, 1957, which was after the renewal of the policy, the vessel, while being towed on the Mississippi River, in Louisiana, was sunk and became a total loss. The Tug Vigilant had the vessel in tow and Joseph Jurisich was the owner of the said tug.
Stovall was indebted to the First National Bank of Lafayette and the policy issued by Fireman’s Fund Insurance Company was made payable to Stovall and to the said Bank as loss payees. Accordingly, the said Insurance Company issued its draft in the sum of $30,000, payable to the said Bank and to Stovall. Stovall endorsed that draft and delivered it to the First National Bank of Lafayette and the full proceeds, $30,000, were thus paid to the First National Bank of Lafayette and applied to the indebtedness of Stovall.
There was brought in the name of Sto-vall a libel proceeding in the United States District Court for the Eastern District of Louisiana. The Tug Vigilant and Jurisch were made libelees and it was alleged that the value of the Quarterboat which had been lost was $40,000. At this time Mr. James J. Morrison, who now represents First National Bank of Lafayette in this proceeding, represented the Tug Vigilant, as did the law firm of Phelps, Dunbar, Marks, Claverie & Sims. As a result of this libel proceeding, it developed that a compromise settlement might be made, and, as a step towards that settlement, the insurers of Jurisch and Jurisch himself and the insurers of the Tug Vigilant deposited with the law firm of Phelps, Dunbar, Marks, Claverie & Sims a total sum of $15,000.
After the Lafayette Bank received the payment of $30,000 from the insurers apparently there still remained due to it some part of the original debt of Stovall. This debt had no relationship to the matter involved in the libel proceeding. Stovall was a resident of the State of Texas, and Morrison, the attorney who represented the Tug Vigilant in the libel proceeding, now became attorney for the First National Bank of Lafayette and, knowing of the fund which had been accumulated in the hands of the Phelps law firm, brought this non-resident attachment proceeding against Stovall in the Civil District Court for the Parish of Orleans and attempted by garnishment proceedings to attach the said fund as belonging to Stovall. Interrogatories were addressed to the Phelps law firm which, in answer thereto, stated that it had in its possession a fund of $15,000, but alleged that the fund did not belong to Sto-vall, and that the Fireman’s Fund Insurance Company, as subrogee, was entitled to it and had, in the name of Stovall, but it, the insurer, being the real party at interest, brought the libel proceeding from which the fund had resulted. The First National Bank of Lafayette then attempted to traverse the answers of the said Phelps law firm and to have it held that the fund actually belonged to Stovall since it resulted from a libel proceeding in which he had been li-belant.
There was judgment dismissing the rule to traverse and the matter is now before us on appeal by the Lafayette Bank.
The sole question is whether the plaintiff bank is correct in its contention that the fund, which was produced as a result of the libel proceeding brought in the name of Stovall, belongs to him and should be so held.
It may be well to mention at this time that, in the libel proceeding, Stovall has filed a document and an affidavit in which he states that he has no interest whatever in the libel proceeding and that whatever may be recovered in that proceeding belongs entirely to his insurer, Fireman’s Fund Insurance Company, and that he desires to withdraw as libelant and to substitute Fireman’s Fund Insurance Company, and that there be entered in that libel proceeding a decree in favor of the said Insurance Company in the sum of $15,000.
*715 Morrison, on behalf of plaintiff Bank, concedes that even though there was no conventional subrogation when the amount of the policy was paid and even though there was no stipulation in the policy providing for subrogation, nevertheless subro-gation automatically results from payment where made under a policy issued in accordance with law. In his brief Morrison, counsel for the Bank, makes this concession in the following words:
“ * * * Plaintiff admits that ordinarily a marine insurer is entitled to subrogation on payment of a maritime loss under a marine policy even in the absence of a subrogation agreement, * * *»
However, it is argued on behalf of plaintiff Bank that, for two reasons, the insurer may not claim to own the fund in question and that, for still a third reason, if it may make claim, this claim must be limited to $5,000 for reasons which we shall later discuss.
The first of the reasons for which it is asserted that the insurer may not claim the fund is that the policy, which it issued to Stovall and as a result of which it now claims to be subrogee, was illegal in that it was issued without the counter-signature of an agent authorized to do business in Louisiana, and for the additional reason that no commission was paid to a Louisiana agent, both of which, the counter-signature and the payment of the commission, are required by Louisiana law.
The second of these reasons is that, by allowing a libel proceeding to be filed in the name of Stovall, the Fireman’s Fund Insurance Company, even if it legally became the subrogee, “held out” that Stovall was the owner of the claim and that by such “holding out” is now estopped to assert that Stovall is not the owner of the fund.
The third reason on which is based the contention that, in any event, the claim of the insurer must be limited to $5,000 is that, by the allegations of the libel proceeding and the showing of the amount paid to Stovall and to the Bank by the insurer, it appears that Stovall did not recover the full amount of his loss and that in such case an insurer who is subrogated may not make claim against a tortfeasor unless and until the entire loss of the insured has been recovered.
What the Bank contends is simply this. The full amount of insurance coverage was $30,000 and this amount was paid. In the libel proceeding it was alleged that the value of the vessel which was lost was $40,000 and thus Stovall, even after obtaining the full amount of the policy, $30,000, has sustained a net loss of $10,000 and that therefore out of the $15,000 on deposit, the first $10,000 is due to Stovall and that this would leave only $5,000 for Fireman’s Fund Insurance Company, even if it is entitled to proceed as legal subrogee.
There are two very potent reasons which prevent our agreeing with plaintiff that the law, which is known as the countersignature law, prevents the insurer from making claim to the entire amount of the deposit and thus preventing a holding that that deposit is the property of Stovall. One of these is that the plaintiff, having accepted the full amount of the policy, cannot be heard to contend that the policy was illegal from its inception, and, having, as loss payee, accepted the proceeds of the insurance policy, may not now contend that the policy was illegally issued and that no subrogation can flow from payment under the policy.
While we feel that no authority is needed to support this view — that the Bank is es-topped to question the validity of the policy —we find that in a somewhat similar situation the Court of Appeal for the First Circuit, in Central Surety & Ins. Corp. v. Canulette Shipbuilding Co., Inc., 195 So. 114, 116, said that, because of the facts of that case, it did not feel it necessary to invoke the doctrine of estoppel, but that
“ * * * if it were necessary to apply this principle, we think there would *716 be ample authority for doing so in this case, as the defendant received and accepted the benefits under the very provisions of the endorsements which it now .claims to be invalid because not properly signed. * * * ”
The Court also said :
“ * * * the defendant company continued to accept these benefits and recognized the validity of the policy after its officers found out that the endorsements were not properly countersigned. It is a well established principle that a party cannot voluntarily accept the benefits flowing from a contract and then when sued by the other party to enforce some provisions of the contract from which the benefits arose, set up the illegality of the contract on account of some informality in its confection. Burk v. Livingston Parish School Board, 190 La. 504, 182 So. 656; Turfitt v. Police Jury of Tangipahoa Parish, 191 La. 635, 186 So. 52; 17 C.J.S. Contracts p. 419, sec. 69.”
We think, furthermore, that the counter-signature law on which the plaintiff relies has no application to a situation such as this. The contract of insurance was made in Texas, by a citizen of Texas, with an insurance company in Texas, but which Insurance Company was authorized to do business in Louisiana. The policy contemplated the fact that the vessel in question would be used both in Louisiana and in Texas and, therefore, when it became necessary to renew the policy, the mere fact that by chance the vessel was in Louisiana, we think prevented the application of the counter-signature law and did not make the issuance of the renewal illegal.
In such situations an insurance policy is governed by the law of the place where it is entered into, the policy delivered and the premiums paid. See Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178, and Metropolitan Life Ins. Co. v. Haack, 50 F.Supp. 55, 60, in which Judge Porterie of the United States District Court of the Western District of Louisiana quoted with approval from 32 C.J., Verbo Insurance, under the subheading, Conflicts of Law, the following:
“The act of the parties in entering into a contract at a particular place indicates prima facie their intention to contract with reference to the laws of that place; and accordingly, as a rule, an insurance contract is governed as to its nature, validity, and interpretation by the law of the place where it was made, unless the parties clearly appear to have had some other place in view; * * *.” See also 44 C.J.S. Insurance § 52.
Counsel for plaintiff cites several cases in which it was held that such a countersignature law is not unconstitutional. We have no doubt at all of the soundness of these decisions, but we think that they do not require that, where such a transitory risk is involved, it is necessary that where, by chance, the property contemplated happens to be in some state in which there is such a counter-signature law, the policy must be countersigned by an agent in that State. We think the very situation was recognized in Watson v. Employers Liability Assurance Corporation, 348 U.S. 66, 75 S.Ct. 166, 172, 99 L.Ed. 74, in which Mr. Justice Frankfurter, in a concurring opinion, referring to the case of Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., supra, said:
“In the Hartford Indemnity case, as here, the policy covered transitory risks, * * * ”.
For both of these reasons, because of estoppel and because the law relied upon does not apply to such a situation, we feel that the contention of the plaintiff, that the fund belongs to Stovall, cannot be accepted.
A second reason given by plaintiff for contending that Stovall is the owner of the fund is that, by “holding out” Stovall as the *717 owner when the libel proceeding was brought, Fireman’s Fund Insurance Company is now estopped to contend that Stovall does not own the fund.
It is conceded that it is customary in admiralty matters such as that from which the libel proceeding resulted for the sub-rogee insurer, having paid the loss, to bring the libel proceeding in the name of the insured. In the Fredensbro case, 38 F.2d 501, 504, the United States District Court for the Eastern District of Pennsylvania said:
* * The general rule is well established that an underwriter who has paid a loss is entitled to recover what he has paid by a suit in the name of the assured against the carrier who caused the loss. Hall & Long v. The Railroad Companies, 80 U.S. (13 Wall.) 367, 20 L.Ed. 594; The Potomac, 105 U.S. 630, 26 L.Ed. 1194; The Fort Gaines (D.C.) 24 F. (2d) 849.”
The “holding out” doctrine contended for by plaintiff has no application unless there has been a misleading and the party misled has been placed in a false position or has abandoned some claim or right which otherwise would have existed. We do not see that the slightest harm came to the plaintiff here, particularly since it is quite certain that it and its attorney had full knowledge of all of the circumstances and well knew that the Fireman’s Fund Insurance Company, having paid the loss, had become automatically subrogated to the rights of Stovall.
When we come to consider the contention that, in any event, Stovall is entitled to $10,000 out of the $15,000 on deposit, again we are unable to agree with the argument presented on behalf of the plaintiff. The principle contended for might be applied if there existed a controversy between Stovall and Fireman’s Fund Insurance Company as to the ownership of that fund or any part of it. It is quite true that, where an insurer pays a part of the loss and there is recovery from a tortfeasor, the insured should be made whole before the insurer may claim any portion of the recovery from the tortfeasor. Here, however, Stovall not only has made no claim to any part of the fund, but has formally declared that he has no interest in it whatever. Furthermore, there is nothing to show that the real value of the boat exceeded the payment which had been made by the insurers. All that we have in that regard is the allegation in the libel.
For all of these reasons we fully agree with the finding of the District Judge which is to the effect that “plaintiff failed to sustain the burden of proof in traversing the answers of the garnishee.” And we also agree with his statement that: “Plaintiff, having received the proceeds of the insurance policy of the Insurance Company on the Q/B REX, as an assured and loss payee, is now estopped to attack the validity of the policy * *
Accordingly the judgment appealed from is affirmed at the cost of appellant.
Affirmed.